UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIANA GUZMAN, et al., | Case No. 17-cv-02606-HSG |
| Plaintiffs, | **ORDER DENYING MOTION FOR CLASS CERTIFICATION** |
| v. | Re: Dkt. No. 82 |
| CHIPOTLE MEXICAN GRILL, INC., et al., | |
| Defendants. | |

Pending before the Court is the motion for class certification filed by Plaintiffs Adriana Guzman, Juan Pablo Aldana Lira, and Jonathan Poot. *See* Dkt. No. 82. The Court held a hearing on the motion on June 18, 2019. *See* Dkt. No. 114. Having carefully considered the parties' arguments, the Court **DENIES** the motion.

## I.   BACKGROUND

Plaintiffs filed this putative class action on February 17, 2017, in San Francisco County Superior Court, asserting claims for employment discrimination, harassment, and retaliation under California law. *See* Dkt. No. 1-1, Ex. A. Defendants Chipotle Mexican Grill, Inc. and Chipotle Services, LLC,[1] removed this action on May 5, 2017. *See* Dkt. No. 1. Plaintiffs allege that Defendants and their corporate policies "systematically discriminate" against their employees based on employees' "Hispanic race and/or Mexican national origin." *See* Dkt. No. 75 ("SAC") ¶ 1. In the operative complaint, Plaintiffs allege several types of discriminatory conduct against

---

[1] The Court acknowledges that Defendants have argued in their motion for summary judgment that they are distinct legal entities and Plaintiffs have no standing to sue Chipotle Mexican Grill, Inc. ("CMG") because Chipotle Services, LLC ("CSL") rather than CMG actually employs those who work at the restaurant. *See* Dkt. No. 83 at 1–2, 11. The Court has taken Defendants' motion for summary judgment under submission, but for purposes of this order on class certification, refers to CMG and CSL collectively as "Defendants."

United States District Court
Northern District of California

individuals who are Hispanic or of Mexican national origin, including: failing to promote otherwise qualified individuals because they either speak English poorly or speak English with an accent; falsifying or providing unsubstantiated poor performance reviews; subjecting individuals to verbal taunting, offensive language, and racial jokes; and wrongfully terminating individuals who would not quit on their own. *See id.* ¶¶ 33–42, 48–70, 74–81, 85–89. Based on these allegations, Plaintiffs bring several causes of action against Defendants under the California Fair Housing and Employment Act ("FEHA"), Cal. Gov't Code §§ 12940 *et seq.*, for disparate treatment employment discrimination; disparate impact employment discrimination; harassment on the basis of race or national origin; failure to prevent discrimination and harassment; and retaliation. *See id.* ¶¶ 94–137.

For purposes of class certification, however, Plaintiffs have narrowed the scope of their allegations. Specifically, Plaintiffs contend that Defendants have two uniform and facially discriminatory policies that support class certification as to their disparate impact, harassment, and failure to prevent discrimination claims[2]: (1) an unwritten English-only policy, by which Defendants prohibit their employees from speaking Spanish in the workplace ("English-Only Policy"); and (2) a promotion policy, which requires employees to demonstrate a subjective level of English proficiency before they are eligible for promotion to management positions ("Promotion Policy"). *See also* Dkt. No. 82 at 1, 4–11.

In support of these allegations, Plaintiffs proffer declarations from several former employees, including the three named Plaintiffs, who describe their individual experiences working for Defendants in several California locations. *See id.* at 7–11; *see also* Dkt. No. 82-30, Exs. A–H (Declarations of Adriana Guzman; Juan Pablo Aldana Lira; Jonathan Poot; Carmen Cortez; Maria Gomez; Norma Mata; Cindy Ortiz; and Francisco Ramirez Salinas). All eight former employees assert that their managers spoke English, *see* Dkt. No. 82-30, Ex. A ¶ 11, Ex. B ¶ 11, Ex. C ¶ 11, Ex. D ¶ 9, Ex. E ¶ 8, Ex. F ¶ 9, Ex. G ¶ 9, Ex. H ¶ 9; six of the eight were told that they could not speak Spanish at least some of the time in the restaurant, *see id.*, Ex. A ¶¶ 13–

_____

[2] Plaintiffs concede that they do not seek class certification as to their disparate treatment or retaliation claims. *See* Dkt. No. 82 at 11, n.54.

15, Ex. C ¶¶ 13–14, Ex. D, ¶¶ 11–12, Ex. E ¶ 11, Ex. G ¶¶ 11–13, Ex. H ¶¶ 11–13; and six of the eight understood that they had to speak English "well" or "perfect" to be eligible for further promotion, *see id.*, Ex. A ¶¶ 21–22, 25, Ex. B ¶¶ 13–19, Ex. D ¶ 13, Ex. E ¶¶ 10–11, Ex. F ¶¶ 11–12, Ex. H ¶¶ 14, 16–17.  Additionally, Plaintiffs cite to an anonymous complaint from 2011 describing events in which two employees were terminated for speaking Spanish, *see* Dkt. No. 82-26, Ex. 23 at 12, as well as allegations in several other cases in which employees allege that they were harassed, threatened with termination, or actually terminated for speaking Spanish in the restaurant, *see* Dkt. Nos. 82-28; 82-29, Exs. A–F.[3]

Plaintiffs also point to several English language programs that Defendants offered employees who were otherwise ready for promotion.  *See* Dkt. No. 5–6; *see also* Dkt. No. 82-8, Ex. 7; Dkt. No. 82-9, Ex. 8; Dkt. No. 82-10, Ex. 9; Dkt. No. 82-11, Ex. 10; Dkt. No. 82-12, Ex. 11.  Although not mandatory, Plaintiffs contend that the Language Development Assistance Program ("LDAP") and Immersion Restaurant Program in particular were designed for "top performers" who were otherwise "ready for promotion" but lacked the requisite language skills. *See* Dkt. No. 82 at 6–7; *see also* Dkt. Nos. 82-8, Ex. 7; Dkt. No. 82-9, Ex. 8; Dkt. No. 82-10, Ex. 9; Dkt. No. 82-11, Ex. 10; Dkt. No. 82-12, Ex. 11 (dated August 2011).  LDAP was advertised in both English and Spanish to "top performer[s] whose only barrier to promotion is [their] need for English language skills."  *See* Dkt. No. 82-11, Ex. 10.  And similarly, Defendants' training materials explained that "[t]here will always be high performers who have English language

---

[3] Plaintiffs ask the Court to take judicial notice of these documents, citing Federal Rule of Evidence 201.  *See* Dkt. Nos. 82-28; 82-29, Exs. A–F.  Federal Rule of Evidence 201 enables the Court to take judicial notice of adjudicative facts that are, *inter alia*, "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  Fed. R. Civ. P 201(f).  Although the Court "may take judicial notice of court filings and other matters of public record," *see Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006), Plaintiffs appear to seek judicial notice of the truth of the allegations contained in these documents.  Such allegations are not the sort of undisputed facts generally subject to judicial notice.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (noting in context of motion to dismiss that "[a] court may take judicial notice of matters of public record . . . But a court may not take judicial notice of a fact that is subject to reasonable dispute" (quotation omitted)).  This is particularly true here, where the cases appear to have all been dismissed without any final adjudication of the underlying merits.  Nevertheless, Defendants do not oppose the request for judicial notice of these documents, and the Court accordingly **GRANTS** Plaintiffs' request to the extent that it recognizes the existence of the documents, but not the truth of their contents.  *See* Dkt. No. 82-28.

proficiency as a barrier," but Defendants "can help them overcome this barrier and achieve their goals." *See* Dkt. No. 82-9, Ex. 8 at 22 (dated October 2009).  Plaintiffs do not identify when these programs were in effect, though Mr. Lira states that his manager told him in October 2011 that Defendants would no longer offer English classes.[4]  *See* Dkt. No. 82-30, Ex. B ¶ 19; *see also* Dkt. No. 82-9, Ex. 8 at 22 (dated October 2009); Dkt. No. 82-12, Ex. 11 (dated August 2011).

Plaintiffs allege that both the English-Only Policy and the Promotion Policy served to harass employees who are Hispanic or of Mexican national origin; are facially discriminatory; and are a per se FEHA violation.  *See* Dkt. No. 82 at 17–19; Dkt. No. 107 at 5–6.  FEHA prohibits employment discrimination based on, *inter alia*, race, national origin, and ancestry.  *See* Cal. Gov't Code §§ 12940 *et seq.*  More granularly, "[i]t is an unlawful employment practice for an employer . . . to adopt or enforce a policy that limits or prohibits the use of any language in the workplace, unless . . . [t]he language restriction is justifed by business necessity" and "[t]he employer has notified its employees of the circumstances and the time when the language restriction is required to be observed and of the consequences for violating the language restriction."  *See* Cal. Gov't Code § 12951(a).

Plaintiffs conclude that Defendants had no business necessity for the English-Only Policy or the Promotion Policy, and on the basis of these allegations, move to certify a single class, defined as:

> All current and former hourly employees of Chipotle, who are Hispanic and/or of Mexican national origin, and worked at Chipotle restaurant locations in California during the period November 14, 2011 until the resolution of this action (the "Class").

*See* Dkt. No. 82 at 2.  The parties agree that the class consists of approximately 43,000 employees from 400 different California Chipotle restaurants.  *See* Dkt. No. 88 at 1.

## II.   EVIDENTIARY OBJECTIONS

In addition to their opposition to the motion for class certification, Defendants also filed briefs styled as "evidentiary objections" to the declarations and accompanying exhibits that

---

[4] During the hearing on the motion for class certification, Plaintiffs' counsel could not confirm whether the programs still exist.

Plaintiffs submitted in support of their motion for class certification. *See* Dkt. Nos. 86, 87. However, Defendants' submissions do not comply with the Civil Local Rules, which require that "[a]ny evidentiary and procedural objections to the motion must be contained within the [opposition] brief or memorandum," and that any such brief or memorandum may not exceed 25 pages. *See* Civil L.R. 7-3(a), 7-4(b). The Court accordingly **STRIKES** the evidentiary objections from the record and does not consider them for purposes of this order.

## III. CLASS CERTIFICATION STANDARD

Federal Rule of Civil Procedure 23 governs class actions, including the issue of class certification. Class certification is a two-step process. To warrant class certification, a plaintiff "bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ("A party seeking class certification must affirmatively demonstrate [her] compliance with the Rule.").

Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

If the four prerequisites of Rule 23(a) are met, a court also must find that the plaintiff "satisf[ies] through evidentiary proof" one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Plaintiffs assert that they meet the requirements of both Rule 23(b)(2) and 23(b)(3). *See* Dkt. No. 82 at 15–16, & n.62. Rule 23(b)(2) provides for certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3), in turn, applies where there is both

5

"predominance" and "superiority," meaning "questions of law or fact common to class members predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3).

The Court's "class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (citing *Dukes*, 564 U.S. 350–51). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1194–95; *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[A] district court *must* consider the merits if they overlap with the Rule 23(a) requirements."). The issue to be decided in a certification motion is whether the case should be "conducted by and on behalf of the individual named parties only" or as a class. *See Dukes*, 564 U.S. at 348.

## IV.    DISCUSSION

As noted above, Plaintiffs move to certify a class of approximately 43,000 "current and former hourly employees of Chipotle, who are Hispanic and/or of Mexican national origin and worked at Chipotle restaurant locations in California" from November 14, 2011, to the present. *See* Dkt. No. 82 at 2. In response, Defendants assert that (1) Plaintiffs lack constitutional standing; (2) the class definition is overly broad; (3) Plaintiffs have failed to meet the requirements of Federal Rules of Civil Procedure 23(a); and (4) Plaintiffs have failed to the meet the requirements of Federal Rule of Civil Procedure 23(b). *See* Dkt. No. 88. The Court addresses each argument in turn.

### A.    Standing

As a preliminary matter, Defendants contend that the named Plaintiffs lack Article III standing to bring their claims because they were not injured by Defendants' alleged policies. *See* Dkt. No. 88 at 10–11. According to Defendants, even if the Court were to assume Defendants have an English-Only Policy and a Promotion Policy, Plaintiffs Guzman, Lira, and Poot did not

1    personally experience them.  *Id.*  Defendants argue that named Plaintiffs were not prevented from

2    speaking Spanish at their respective restaurants; Plaintiffs Guzman and Lira were promoted

3    several times during the course of their employment; and Plaintiff Poot never even sought a

4    promotion.  *Id.* at 11.

5         The Ninth Circuit has held that at least one named plaintiff must "demonstrate[] her

6    individual standing to bring a claim" before "the court proceeds to consider whether the Rule

7    23(a) prerequisites for class certification have been met."  *Melendres v. Arpaio*, 784 F.3d 1254,

8    1261–62 (9th Cir. 2015).  To establish Article III standing, a plaintiff must show an injury-in-fact

9    that is:  (1) concrete and particularized, as well as actual or imminent; (2) fairly traceable to the

10   challenged action of the defendant; and (3) likely redressable by a favorable ruling from the court.

11   *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  "A plaintiff must demonstrate

12   standing for each claim he or she seeks to press and for each form of relief sought."  *Wash. Envtl.*

13   *Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (citing *DaimlerChrysler Corp. v. Cuno*,

14   547 U.S. 332, 352 (2006)).  However, "'the manner and degree of evidence required'" for the

15   plaintiff to meet her burden of proof to establish standing depends on the "'stage[] of the

16   litigation.'"  *Id.* (quoting *Lujan*, 504 U.S. at 561).  As the Ninth Circuit has acknowledged, "the

17   manner and degree of evidence required at the preliminary class certification stage is not the same

18   as at the successive stages of the litigation—i.e., at trial."  *Sali v. Corona Reg'l Med. Ctr.*, 909

19   F.3d 996, 1006 (9th Cir. 2018) (quotation omitted).

20        Neither the Supreme Court nor the Ninth Circuit has identified the precise evidentiary

21   burden a putative class representative must satisfy to establish her standing at the class

22   certification stage.  However, the Ninth Circuit has recently suggested that the putative class

23   representatives must "present[] evidence" to establish Article III standing, rather than merely

24   resting on their allegations at the class certification stage.  *See B.K. by next friend Tinsley v.*

25   *Snyder*, 922 F.3d 957, 966 (9th Cir. 2019); *cf. Lujan*, 504 U.S. at 561 (noting that although "[a]t

26   the pleading stage, general factual allegations of injury resulting from the defendant's conduct

27   may suffice," in responding to a summary judgment motion, "the plaintiff can no longer rest on

28   such mere allegations").  District courts have similarly concluded that putative class

United States District Court
Northern District of California

representatives "must demonstrate, not merely allege, that they have suffered an injury-in-fact to establish Article III standing to bring the claims asserted on behalf of the [class]." *Evans v. Linden Research, Inc.*, No. C 11-01078 DMR, 2012 WL 5877579, at *6 (N.D. Cal. Nov. 20, 2012); *see also Torres v. Air to Ground Servs., Inc.*, 300 F.R.D. 386, 393 (C.D. Cal. 2014) (finding that standing must withstand a "rigorous analysis") (citing *Dukes*, 564 U.S. at 351); *Sethavanish v. ZonePerfect Nutrition Co.*, No. 12-2907-SC, 2014 WL 580696, at *3 (N.D. Cal. Feb. 13, 2014) ("At class certification, the plaintiff must present evidence supporting such allegations."). The Court finds this approach both persuasive and consistent with Rule 23's requirement that a plaintiff establish her entitlement to class certification by a preponderance of the evidence, *see Dukes*, 564 U.S. at 350–351, and accordingly analyzes Plaintiffs' *evidence* of standing, rather than just their allegations of such.

Here, Plaintiffs have submitted declarations attesting that they were subjected to discrimination and harassment during their employment and suffered injury because of it. Plaintiff Guzman, for example, states that her English skills were not as well developed when she worked for Defendants and that her managers told her that she could not speak English in the restaurant. *See* Dkt. No. 82-30, Ex. A at ¶¶ 7, 13–15, 30. Moreover, a manager yelled at her for her inability to speak proper English when she first sought a promotion; she states that she was passed over for promotion because she was Latina and spoke English with an accent; and she had to take English courses before she could even be considered for promotion. *See id.* at ¶¶ 22–23, 25–27, 30.

To the extent Defendants suggest that Ms. Guzman is actually fluent in English and only subjectively believes she was passed over for promotion because of her lack of fluency, *see* Dkt. No. 88 at 11–12, Defendants are essentially asking the Court to assess the credibility of Plaintiffs' statements regarding their experience in the workplace. It would be inappropriate to make such a determination on a motion for class certification. At this stage, the Court finds that the Plaintiffs have met their burden to establish standing such that the Court may proceed to determine whether they have met the requirements of Rule 23.

//

### B. Overbreadth

Defendants next contend that the class cannot be certified because the class definition is overbroad. *See* Dkt. No. 88 at 12. Defendants assert that the class definition "necessarily includes individuals who could not have been injured by [Defendants'] alleged wrongful conduct" because some employees who identify as Hispanic or of Mexican national origin may only speak English; speak English fluently; or may have preferred to speak English. *See id.* at 12–13 (quotation omitted). In other words, Defendants suggest that the class definition, which relies on employees' national origin, offers an imprecise proxy for those who would be affected by Defendants' alleged English-Only and Promotion Policy.

Defendants suggest that the Court should consider this overbreadth argument independent of the Rule 23 analysis, citing *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012). However, in *Mazza* the Ninth Circuit discussed overbreadth in the context of predominance under Rule 23(b), and not as a separate inquiry. The putative class members in *Mazza* asserted misrepresentation-based claims against Defendant under California law based on statements that the Defendant had made about vehicles equipped with a "Collision Mitigation Braking System" ("CMBS"). *Id.* at 585–87. The Ninth Circuit reasoned that the CMBS advertising was limited, so it would be unreasonable to assume that all persons who purchased the vehicle with CMBS were exposed to advertising about it. *Id.* at 596. The Court accordingly vacated class certification on the basis of predominance under Rule 23(b), holding that class certification was improper "because common questions of fact do not predominate where an individualized case must be made for each member showing reliance." *Id.*; *accord Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136–38 (9th Cir. 2016).

Defendants' argument here is similarly reflective of the individualized inquiries that would be necessary to determine whether a class member has suffered any injury in the first place. The Court will therefore address these arguments in its discussion of whether Plaintiffs meet the commonality and typicality requirements of Rule 23(a), rather than treating overbreadth as its own separate barrier to class certification.

//

## C. Rule 23(a)

### i. Numerosity

Rule 23(a) requires that the putative class be "so numerous that joinder of all members is impracticable." *See* Fed R. Civ. P. 23(a)(1). The more than 40,000-person putative class easily satisfies the numerosity requirement, and Defendant does not appear to contest that this requirement is met. *See* Dkt. No. 88 at 13–19.

### ii. Commonality

The Court finds that the "crux of this case is commonality." *See Dukes*, 564 U.S. at 349. Rule 23(a)(2) requires that "there are questions of law or fact common to the class." A contention is sufficiently common where "it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Commonality exists where "the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class." *Parra v. Bashas', Inc.*, 536 F.3d 975, 978–79 (9th Cir. 2008). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes*, 564 U.S at 350 (citation omitted) (emphasis omitted).

Here, as referenced above, Plaintiffs seek to certify a class for purposes of their disparate impact, harassment, and failure to prevent discrimination claims. Plaintiffs allege that commonality exists as to these claims because all employees were "subjected to the same written and unwritten policies," and thus common questions of law and fact exist regarding whether such policies are discriminatory or harassing. *See* Dkt. No. 82 at 13. Defendants respond that Plaintiffs' claims will require individualized inquiries into such policies, including the subjective decision-making by Defendants' supervisors who had discretion to implement the challenged policies, to the extent they existed, at individual restaurants. *See* Dkt. No. 88 at 15–16.

Defendants point to *Wal-Mart Stores, Inc. v. Dukes*, in which the Supreme Court ruled that a group of female employees could not be certified as a nationwide class because they were subject to different, regional promotion and pay policies. *See* 564 U.S. at 356–60. In *Dukes*, the

10

plaintiffs alleged that the local managers had discretion over employees' promotion and pay, and that because of the company's "strong and uniform 'corporate culture,'" the managers "exercised [this discretion] disproportionately in favor of men, leading to an unlawful disparate impact on female employees." *See id.* at 344–45. In finding that the plaintiffs could not satisfy Rule 23(a)'s commonality requirement, the Supreme Court observed that "Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters" was "[o]n its face . . . just the opposite of a uniform employment practice that would provide the commonality needed for a class action . . . ." *Id.* Accordingly, following *Dukes*, plaintiffs who seek to challenge a discretionary system must identify "a common mode of exercising discretion that pervades the entire company." *Id.* at 356.

Plaintiffs attempt to sidestep *Dukes* entirely by asserting that the English-Only Policy and the Promotion Policy are inherently discriminatory and per se violations of FEHA. *See* Dkt. No. 107 at 5. As such, Plaintiffs urge, these policies "are evidence of discriminatory practices that harmed the entire class." *Id.* Plaintiffs distinguish *Dukes* because there the plaintiffs did not allege "any express corporate policy." *See Dukes*, 564 U.S. at 344. Plaintiffs' argument, however, misses the point. At class certification, the Court does not accept at face value Plaintiffs' theory of the case, and must instead engage in a "rigorous analysis . . . [into whether] . . . the prerequisites of Rule 23(a) have been satisfied." *Id.* at 351 (quotation omitted). Although the Court need not determine whether an English-Only or Promotion Policy would be discriminatory or harassing at this time, the Court must nevertheless still assess "whether there was a common pattern and practice that could affect the class as a whole." *See Ellis*, 657 F.3d at 983. Throughout their motion for class certification and reply briefs Plaintiffs assume that the alleged English-Only Policy and Promotion Policy are uniform corporate policies that were uniformly implemented across Defendants' 400 California restaurants. *See, e.g.*, Dkt. No. 82 at 13 ("Here, all Class Members were subjected to the same company-wide English-only and Promotion policies."); Dkt. No. 107 at 5 ("These uniform policies pose common questions of fact and law that would be best address through the class mechanism."). It is not enough at the class certification stage, however, to simply assert that there were company-wide policies. As the Supreme Court noted in *Dukes*,

commonality may be established through "*[s]ignificant proof* that an employer operated under a general policy of discrimination . . . if the discrimination manifested itself in hiring and promotion practices in the same general fashion." *Dukes*, 564 U.S. at 353 (quotation omitted) (emphasis added). The evidence Plaintiffs have tendered here in support, however, actually rebuts the inference that Defendants uniformly imposed such policies in their California restaurants.

*First*, Plaintiffs allege that in approximately 2008, Defendants "adopted an unwritten English-only policy, which prohibited Spanish-speaking employees from speaking Spanish in Chipotle restaurants." *See* Dkt. No. 82 at 9. As evidence of this unwritten corporate policy, Plaintiffs cite the experience of eight declarants and four other individuals who filed separate lawsuits against Defendants, out of the 43,000 putative class members. *See* Dkt. No. 82-30, Exs. A–H; Dkt. No. 82-29, Ex. A–D. Putting aside whether twelve accounts, representing just .03% of the putative class, could on their own prove the existence of a state-wide corporate policy, the declarants' differing experiences belie Plaintiffs' asserted basis for class-wide adjudication.

Only six of the declarants said that they were told they could not speak Spanish in some capacity in the restaurant. *See* Dkt. No. 82-30, Ex. A ¶¶ 13–15, Ex. C ¶¶ 13–14, Ex. D, ¶¶ 11–12, Ex. E ¶ 11, Ex. G ¶¶ 11–13, Ex. H ¶¶ 11–13. Four of them were told that they could not speak Spanish at all while in the restaurant. Ms. Guzman and Mr. Poot, while working at the same store, for example, stated that their general manager told them in 2008 that "Chipotle was demanding that all employees must speak English in the restaurant." *See id.*, Ex. A ¶¶ 13–14; *id.*, Ex. C ¶¶ 13–14; *see also id.*, Ex. D ¶ 11–12; *id.* Ex. G ¶¶ 11–13. However, Ms. Guzman clarified that "employees were generally able to speak in Spanish among themselves" at the restaurant. *See id.*, Ex. A ¶ 15. Mr. Salinas was told by his general manager following a customer complaint that "employees had to speak in English while they were working the line" with customers. *See id.*, Ex. H, ¶¶ 11–12. And Ms. Gomez was told by her general manager that she had to speak in English to the kitchen manager. *See id.*, Ex. E ¶ 11. Ms. Mata's manager, on the other hand, did not preclude her from speaking Spanish, but raised concerns about her ability to handle food

12

orders in English.  *See id.*, Ex. F ¶¶ 12–13.[5]

Plaintiffs' evidence thus highlights each manager's discretion in determining when Spanish could be spoken in the restaurants and the variability of an English-Only Policy. Determining in this context whether an employee suffered injury based on harassment or discrimination would necessarily turn on individualized inquiries into the managers' actions and decisions.  As the Supreme Court has made clear, individualized inquiries like these are not reasonably susceptible to class adjudication.  *Dukes*, 564 U.S. at 355 ("The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of allowing discretion by local supervisors over employment matters.  On its face, of course, that is just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices.") (emphases omitted).  It is certainly possible to imagine, even in the absence of a formal written policy, that managers could uniformly prohibit employees from speaking Spanish in Defendants' restaurants.  But there is no evidence of this sort of standardized treatment in the record.

*Second*, Plaintiffs allege that "in order to be promoted, Chipotle employees have to meet certain undefined English language requirements."  *See* Dkt. No. 82 at 4.  In establishing the existence of this Promotion Policy, Plaintiffs do not point to a written policy.  Instead, as with the English-Only Policy, Plaintiffs tender anecdotal evidence from class members, as well as English-language instruction programs that Defendants offered employees.  Plaintiffs explain that the LDAP, for example, was advertised in both English and Spanish to "top performer[s] whose only barrier to promotion is [their] need for English language skills."  *See* Dkt. No. 82-11, Ex. 10.  And similarly, Defendants' training materials explained that "[t]here will always be high performers

---

[5] Even if the Court were to consider the allegations in the other lawsuits that Plaintiffs cite, *see* Section I, n.3 above, they further underscore the differences in employees' experiences at different restaurants.  For example, the plaintiff in one of the other four lawsuits alleged that a general manager enacted a "new" policy in 2015 wherein she said employees could not speak Spanish in the workplace.  *See* Dkt. No. 82-29, Ex. C ¶ 31.  The plaintiff further alleged that this manager retaliated against her when the plaintiff reported her policy to human resources.  *See id.*, Ex. C ¶¶ 32–35.  In another case, the plaintiff detailed how two of her supervisors repeatedly harassed her, making racist and offensive statements, and said the two supervisors prohibited her from speaking Spanish.  *See id.*, Ex. A ¶¶ 37–38, 42–43, 46; *accord id.*, Ex. B ¶¶ 15–16.

who have English language proficiency as a barrier," but Defendants "can help them overcome this barrier and achieve their goals." *See* Dkt. No. 82-9, Ex. 8 at 22 (dated October 2009). The implication, Plaintiffs suggest, is that some level of English-language proficiency is required to advance at the company. *See* Dkt. No. 82 at 4–7.

But as with Plaintiffs' theory of a uniform English-Only Policy, Plaintiffs have not offered significant proof that the Promotion Policy was standardized across the company such that there are questions of law or fact common to the class. Plaintiffs provide no evidence, for example, of which positions at the company require English proficiency or what level of proficiency is required for such promotion. The language course offerings that Plaintiffs rely on do not specify if and when an employee may be barred from promotion based on his or her language skills. Instead, one handout says the program is for "*managers* at Chipotle who are ready for promotion, but their only barrier is their English proficiency." *See* Dkt. No. 82-5, Ex. 4 (emphasis added). Another states that it is geared toward "*top performers*" who are "almost going to be promoted, but their only barrier is communication." *See* Dkt. No. 82-6, Ex. 5 (emphasis added); *see also* Dkt. No. 82-7, Ex. 6. And still another states that Defendants "want to empower top performers to reach their full potential," and the LDAP program is intended for such top performers where there is a language "barrier preventing [them] from advancing to the *next level*." *See* Dkt. No. 82-7, Ex. 6 (emphasis added).

The named Plaintiffs and declarants also indicate that they experienced disparate policies and requirements for promotion. *See* Dkt. No. 82-30, Exs. A–H.

- Ms. Guzman's general manager "failed" her when she first tried to advance from crew member to kitchen manager because she "was unable to pronounce the word 'limp.'" *See id.*, Ex. A ¶ 22. Only later in 2008 was she promoted from a crew member to a kitchen manager, and then to a service manager. *Id.* But before she could be promoted to apprentice, her general manager Mr. DeKaristos said she had to attend an English language program. *See id.*, Ex. A ¶¶ 4, 6–7, 22–26. Following her promotion to apprentice in 2011, her managers repeatedly told her that she would be promoted to general manager, she was interviewed for the position in October 2011, but she was not

United States District Court
Northern District of California

1    promoted.  *See id.* at ¶¶ 27–28.

2    • Mr. Lira explained that he was hired as a crew member, but before he was promoted to

3    kitchen manager, he had to pass an oral exam.  *See id.*, Ex. B at ¶¶ 4, 13–14.  As with

4    Ms. Guzman, Mr. DeKaristos failed Mr. Lira the first time "because he supposedly

5    could not understand [Mr. Lira's] English."  *Id.* at ¶ 14.  He also had to take an oral

6    exam for promotion from kitchen manager to service manager.  *See id.* at ¶ 15.

7    Although Mr. Lira repeatedly sought promotion to apprentice, he was passed over

8    because of his English-language skills.  *Id.* ¶ 16.

9    • Mr. Poot, who worked at the same store as Ms. Guzman and Mr. Lira, explained that

10   he " knew several Hispanic managers . . . who were promoted to positions like Kitchen

11   Manager, but were fired after they became managers."  *See id.*, Ex. C ¶ 15.

12   • Ms. Cortez, who was hired as a crew member, explained that she "was told by

13   Chipotle's managers that she needed to learn more English if [she] wanted to be

14   promoted to a higher position." *See id.*, Ex. D ¶ 13.

15   • Ms. Gomez explained that although she was promoted several times during her time at

16   Chipotle, eventually training as an apprentice to become a general manager, her general

17   manager asked her to speak in English to the kitchen manager "because his

18   communication in Spanish would hold him back from being promoted."  *See id.*, Ex. E

19   ¶¶ 4, 11.

20   • Ms. Mata "was told by Chipotle's managers at the Irvine restaurant where [she]

21   worked that [she] was not promoted to a managerial position because [her] English was

22   not perfect," and she was given books "to study for management positions."  *Id.*, Ex. F

23   ¶¶ 12, 15–16.

24   • Ms. Ortiz worked as a service manager, but was never promoted to the apprentice

25   position, though she did not discuss any language requirement for promotion.  *See id.*,

26   Ex. G ¶ 4.

27   The Court does not minimize the declarants' experiences, nor does it opine on whether

28   such conduct would violate California law.  But because Ms. Guzman, Mr. Lira, and Mr. Poot

worked in the same store and had the same general manager, Plaintiffs have only provided evidence that employees in four of the 400 California stores were told at different times while working in Defendants' restaurants that in order to be promoted they needed to improve their English proficiency. This does not suggest that there was a uniform policy that applied to all class members such that there are common questions of law or fact that could be resolved efficiently in a single proceeding.

Plaintiffs try to minimize the extent of managerial discretion for purposes of commonality. They first explain that the principal decisionmakers for the business are the executive officers, executive directors, board of directors, and to a lesser degree, the regional directors who oversee domestic operations in eight large geographic regions in the country. *See* Dkt. No. 82 at 2, & n.3–5 (citing Dkt. No. 82-29, Ex. F at ¶¶ 9–13). Plaintiffs then argue that managers below these individuals, which include Field Leaders and the store managers at each restaurant, do not have the authority to make or change Defendants' policies. *See id.* However, Plaintiffs acknowledge that Defendants left managers to "subjectively evaluate and determine the employees' ability to speak in English." *See* Dkt. No. 82 at 5; *see also* Dkt. No. 82-3, Ex. 2 (E. Smiley Depo. at 33:20–34:17; 38:25–39:15; 79:6–22; 111:4–117:6). Moreover, even assuming Defendants required some level of English proficiency for some promotions, Plaintiffs acknowledge that there is no written policy clarifying what level of English proficiency is required, nor do Defendants provide managers with training or a framework against which to evaluate employees' proficiency. *Id.* In short, managers appear empowered to determine what level of English proficiency is needed and how to test for that proficiency.

The cases that Plaintiffs cite are not to the contrary. *See* Dkt. No. 107 at 6. In *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, for example, the Seventh Circuit found commonality in a race discrimination case where the plaintiffs were brokers challenging two companywide policies at a Merrill Lynch, a "teaming" policy and an "account distribution" policy. 672 F.3d 482, 488–89 (7th Cir. 2012). Under the teaming policy, brokers were permitted to form teams of their own choosing; under the account distribution policy, a departing broker's accounts were distributed according to the past success of the other brokers in a particular office. *See id.*

Unlike here, there was no question that these were corporate-wide policies that applied equally to each class member. The Seventh Circuit therefore concluded that the plaintiffs could challenge both policies, despite the fact that brokers had discretion within these policies of who to team with, because "permitting brokers to form their own teams and prescribing criteria for account distributions that favor the already successful . . . are practices of Merrill Lynch, rather than practices that local managers can choose or not at their whim." *Id.* at 490. As the Court explained above, this proof of corporate-wide, uniform policies is critically missing in Plaintiffs' proffered evidence.

In *Scott v. Family Dollar Stores, Inc.*, the Fourth Circuit reasoned that even following the Supreme Court's opinion in *Dukes*, commonality could be established if there was "a company-wide policy of discrimination." 733 F.3d 105, 114 (4th Cir. 2013). The court, therefore, found error in the district court's decision to dismiss the complaint without leave to amend the class action allegations. *See id.* at 112–14. It did not, however, determine what proffer of evidence would be needed to establish such a company-wide policy for purposes of class certification. *Id.* Similarly, the court in *Calibuso v. Bank of America Corporation*, merely relied on allegations pled in a complaint at the motion to dismiss stage that a uniform employment policy existed that could withstand Rule 23's scrutiny and *Dukes*. *See Calibuso v. Bank of Am. Corp.*, 893 F. Supp. 2d 374, 377–78 (E.D.N.Y. 2012). In denying the motion to dismiss, the court nonetheless noted that if members of the class "experience[] the challenged policies and practices in unique ways," then class certification may be inappropriate. *Id.*

Plaintiffs' reliance on *In re Wells Fargo Home Mortgage Overtime Pay Litigation* is particularly inapt, as there the Ninth Circuit held that a district court abused its discretion in certifying a class where Wells Fargo had uniform overtime exemption policies for all its home mortgage consultants. 571 F.3d 953, 956–59 (9th Cir. 2009). Again, unlike here, there was no question that Wells Fargo had exemption policies that it applied uniformly to class members, as Wells Fargo did not pay them overtime or even track their hours. *See id.* at 955. Nevertheless, the Court reasoned that predominance was not met because, even with these uniform policies, a court would still have to engage in "a fact-intensive inquiry into each potential plaintiff's employment

17

situation." *Id.* at 958–59. (quotation omitted).

In sum, Plaintiffs have not proffered the "[s]ignificant proof that an employer operated under a general policy of discrimination" required to satisfy commonality. *Dukes*, 564 U.S. at 353 (quotation omitted). As the Supreme Court explained, "allowing discretion by local supervisors over employment matters . . . is just the opposite of a uniform employment practice that would provide the commonality needed for a class action." *Id.* at 355; *see also id.* at 358 ("Even if every single one of these accounts is true, that would not demonstrate that the entire company operates under a general policy of discrimination, which is what respondents must show to certify a companywide class." (quotation and alteration omitted)).

### iii.    Typicality

Next, Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation omitted). Under the "permissive standards" of Rule 23(a)(3), the claims need only be "reasonably co-extensive with those of absent class members," rather than "substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In other words, typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quotation omitted). "The commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–158, & n.13 (1982). However, typicality—like adequacy—looks at whether Plaintiffs are proper parties to proceed with the suit. *Id.*

Plaintiffs contend that they satisfy the typicality requirement because they were subjected to the same discriminatory policies as the other absent class members, and thus their claims arise from the same factual and legal theories. *See* Dkt. No. 82 at 14. But Plaintiffs' typicality argument suffers from the same flaw as their commonality argument discussed above. It is not

18

1    enough to conclude that policies that prohibit employees from speaking English or require English

2    proficiency for promotion eligibility would violate the same California laws.  Plaintiffs have not

3    tendered significant proof that the English-Only Policy or Promotion Policy existed on a

4    company-wide basis so as to appl to all class members.  Without this information, the Court

5    cannot assess whether the three Plaintiffs' experiences and related injuries are unique as compared

6    to the rest of the 43,000 putative class members.

7            This problem is further exacerbated by the fact that the three named Plaintiffs all worked at

8    the same restaurant and under the same general managers during overlapping time periods.  *See*

9    Dkt. No. 82-30, Ex. A ¶¶ 2–3, 8 (Guzman worked at the 126 New Montgomery location from

10   2007 to 2012), Ex. B. ¶¶ 2–3, 8 (Lira worked at the 126 New Montgomery location from 2009 to

11   2012), Ex. C ¶¶ 2–3, 8 (Poot worked at the 126 New Montgomery location from 2003 to 2012).

12   When describing being told about the English-Only Policy, Ms. Guzman and Mr. Poot

13   acknowledge that it was conveyed to them by the same manager in the same meeting, in which the

14   manager said that they had to speak English in the restaurant.  *Compare id.*, Ex. A ¶ 14, *with id.*,

15   Ex. C ¶ 13.  Ms. Guzman and Mr. Lira also contend that they were denied promotion by the same

16   manager based on their English-speaking abilities.  *Compare id.*, Ex. A ¶¶ 22, *with id.*, Ex. C ¶ 14.

17   The proposed class, however, is not limited to employees who worked in this single restaurant or

18   only under specific managers.

19           Additionally, even among the three named Plaintiffs, their exposure to the two policies

20   differed.  Ms. Guzman said that she "believe[d] that employees were generally able to speak in

21   Spanish among themselves."  *See id.*, Ex. A ¶ 15.  Mr. Poot explained that he and other employees

22   were told that they "could only speak English in the restaurant," and he "was not allowed to speak

23   Spanish with other employees."  *See id.*, Ex. C ¶ 14.  And Mr. Lira said that he worked with many

24   Hispanic employees and "[m]ost of these workers spoke only Spanish," though he was

25   "prohibit[ed] [] from speaking in Spanish."  *See id.*, Ex. B ¶¶ 12, 28.

26           Plaintiffs' cases do not rebut the significance of these distinctions.  *See* Dkt. No. 82 at 14;

27   Dkt. No. 107 at 7.  In *Stender v. Lucky Stores, Inc.*, the named plaintiffs were food-department

28   employees at a grocery chain who claimed that the defendant denied hours, training, and

promotional opportunities to them as female and black employees. No. C 88-1467 MHP, 1990 WL 192734, at *1 (N.D. Cal. June 8, 1990). The parties, who had agreed on a partial class definition, disagreed on whether the class could include employees who challenged discrimination in their initial department assignments at the grocery store. *Id.* at *4. The court held that the named plaintiffs, who alleged discrimination in job assignments at later stages in their careers, could nevertheless serve as representatives of a class that included employees who suffered discrimination in initial job assignments because an employee's initial assignment influenced his or her subsequent promotion opportunities. *Id.* Plaintiffs also cite *Adams v. Pinole Point Steel Co.*, in which the court concluded that the named plaintiffs' gender and race discrimination claims were typical of both actual applicants' claims and those of prospective applicants who were deterred from applying to the company. No. C-92-1962 MHP, 1994 WL 515347, at *7–*8 (N.D. Cal. May 18, 1994). The court reasoned that based on the plaintiffs' allegations, the company's discriminatory practices made it clear that any such applicants would not be hired. *Id.* at *2, *7–*8. Also, notably, the named plaintiffs included both actual and deterred applicants. *See id.* In both *Stender* and *Adams*, however, there was no question regarding whether the named plaintiffs and absent class members were exposed to similar discriminatory treatment.

Here, on the other hand, there simply is no basis for the Court to conclude based on the record before it that Plaintiffs' experiences were typical of those of the class. *See also* Section IV.C.ii above. The Court's concerns do not rest on superficial factual distinctions such as potential variation in the severity or duration of the policies across stores, but rather more fundamentally go to whether all members of the class were even exposed to these policies at all such that they can claim discrimination or harassment from them.

### iv. Adequacy of Representation

Finally, Rule 23(a)(4) requires that the "representative parties will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). On this question of adequacy, the Court must address two legal questions: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other putative class members; and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the proposed class. *See In re*

20

*Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). This inquiry too "tend[s] to merge" with the commonality and typicality criteria. *See Falcon*, 457 U.S. at 158, n.13.

Defendants do not contest the adequacy of Plaintiffs' legal counsel, nor is the Court aware of any reason why they should. The only challenge Defendants raise regarding adequacy is as to a possible conflict of interest among named Plaintiffs and other class members. *See* Dkt. No. 88 at 18. Defendants contend that Plaintiffs cannot meet the adequacy requirement because some of the named Plaintiffs and declarants were supervisors who may have "participated actively" in the supposedly discriminatory behavior. *See id.* at 19. Defendants also suggest that particularly as to the Promotion Policy, class members in supervisory roles "will have a vested interest in defending the integrity of their decision-making." *See id.*

Assuming Plaintiffs were able to meet the other Rule 23(a) requirements, Defendants do not provide any factual or legal basis to conclude that the named Plaintiffs have any conflict of interest with other class members such that they would be inadequate class representatives. Of the three named Plaintiffs, Ms. Guzman and Mr. Lira eventually advanced to managerial roles. *See* Dkt. No. 82-30, Ex. A ¶ 4, , Ex. B ¶ 4. They do not state that they had any control over the English-Only Policy or Promotion Policy, or that they wielded any authority over employment decisions at the restaurants. To the contrary, they were nevertheless subjected to these policies, though they at times tried to contest them. Ms. Guzman said that when she was being interviewed by the area manager for a general manager position, Ms. Guzman suggested that Mr. Lira could replace her as apprentice. *See id.*, Ex. A ¶ 28. When the area manager suggested that Mr. Lira did not have the requisite language skills, Ms. Guzman informed her that she believed that he *was* qualified. *Id.* And Mr. Lira explained that he actually complained to human resources about the discrimination he witnessed and experienced. *See id.*, Ex. B ¶ 24.

To the extent Defendants suggest, on the other hand, that the named Plaintiffs may have a conflict with a hypothetical class member who voluntarily participated in the discrimination and harassment without simultaneously being injured by them, Defendants have not identified any authority that would find the named Plaintiffs inadequate representatives based on such attenuated conjecture. In *King v. Enterprise Rent-A-Car Co.*, the plaintiffs acknowledged that at least some

of the named plaintiffs actually provided negative evaluations and promotion recommendations as to other class members. 231 F.R.D. 255, 264 (E.D. Mich. 2004); *accord Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 568 (W.D. Wash. 2001). There is no such evidence here.

*     *     *

Nevertheless, having reviewed the Rule 23(a) requirements, the Court finds that Plaintiffs do not satisfy commonality or typicality.[6]

## V.     CONCLUSION

In sum, Plaintiffs have failed to make the requisite showing for class certification and, accordingly, the Court **DENIES** the motion for class certification. The Court **SETS** a further case management conference for February 11, 2020, at 2:00 p.m.

**IT IS SO ORDERED.**

Dated: 1/15/2020

HAYWOOD S. GILLIAM, JR.
United States District Judge

_____

[6] Although the Court need not reach the second part of the class certification process under Rule 23(b), the Court notes that Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P 23(b)(3). The Supreme Court has made clear that Rule 23(b)(3)'s predominance requirement is "even more demanding" than the commonality requirement of Rule 23(a). *See Comcast*, 569 U.S. at 34 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623–24 (1997)). Because Plaintiffs have not met the commonality requirement under Rule 23(a), they have also failed to meet the more demanding predominance requirement under Rule 23(b). *See* Section IV.C.ii.